# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 1005 N CAPITOL ST NE, APT 1410, WASHINGTON D.C. 20002 UNDER RULE 41 | ) ) ) |

Case No. 19-346

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344, 1349, 1956, and 10128 and 1028A | Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, Money Laundering, and Identity Theft. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

G. Paul Samoska, SA, HSI, Badge No. 8438

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 09/23/2019 _____

*Judge's signature*

City and state: Washington, D.C.

G. Michael Harvery, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1005 N CAPITOL ST NE, APT 1410, WASHINGTON<br>D.C. 20002 UNDER RULE 41 | )<br>)<br>)   Case No.  19-346<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia

*(identify the person or describe the property to be searched and give its location)*:

The residence of AISHA CADMUS located at 1005 N CAPITOL ST NE, APT 1410, WASHINGTON, D.C.  20002.  The residence is located in the John and Jill Ker Conway Apartment Building which is a high rise apartment building located in Washington, D.C.  APT 1410 is clearly marked on the front door of the apartment unit.

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence, fruits, and/or instrumentalities relating to the crimes of 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1956 (money laundering), and 1028 and 1028A (identity theft) (as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment B).

      **YOU ARE COMMANDED** to execute this warrant on or before _____ October 7, 2019 _____ *(not to exceed 14 days)*
  ❏ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

      ❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    10/23/2019 3:00 pm _____          _____
                                                    *Judge's signature*

City and state:      Washington, D.C. _____          G. Michael Harvey, U.S. Magistrate Judge
                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>19-346 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
(Place to be Searched)

The property to be searched for the items listed in Attachment B is the residence of AISHA CADMUS located at **1005 N CAPITOL ST NE, APT 1410, WASHINGTON, D.C.  20002**.  The residence is located in the John and Jill Ker Conway Apartment Building which is a high rise apartment building located in Washington, D.C.  APT 1410 is clearly marked on the front door of the apartment unit.



**ATTACHMENT B**
(Items to be seized)

For the period from June 1, 2017, to the present, all documents, records, and property (whether in the form of printed documents or stored in electronic or digital form) that constitute evidence, fruits, and/or instrumentalities relating to the crimes of 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1956 (money laundering), and 1028 and 1028A (identity theft)  further described in the affidavit submitted herewith, including the following:

1. All records and information related to:

    a. property and finances, including bank records, loan records, credit card records, ledgers, checks or other monetary instruments, check registers, bank statements, credit cards, lines of credit, safe deposit box keys and records, deposit records, faxes, memoranda, correspondence, applications, telephone records, receipts, and other financial documents related to **GBENGA OWOLABI, AISHA CADMUS, BERNADETTE ATTIA, FNU NJUH VALENTINE FOMBE**, or any other individual determined to be a victim or accomplice/co-conspirator, known or unknown, of any of them;

    b. travel records for **GBENGA OWOLABI, AISHA CADMUS, BERNADETTE ATTIA, FNU NJUH VALENTINE FOMBE**, or any other individual determined to be a victim or accomplice/co-conspirator, known or unknown, of any of them

    c. records relating to employment, wages, federal, state, and local tax returns, or other sources of income;

    d. identity documents including, but not limited to, U.S. and foreign passports, visas, I-94 Departure Records, birth certificates, social security cards, foreign national identity documents;

    e. all personal identifying information including, e.g., birth dates, social security numbers, address information, maiden name, and credit information;

    f. the acquisition, purchase, or ownership of assets, including currency, titles, deeds, mortgage documents, Forms 1098, receipts, bankruptcy filings and related papers, documents, schedules, correspondence, and payment records

    g. identifying any accomplices or associates of **GBENGA OWOLABI, AISHA CADMUS, BERNADETTE ATTIA, FNU NJUH VALENTINE FOMBE** , including, e.g.,  images, messages, emails, notes, contact lists, as well as any communications with such individuals,

    h. identifying any victim or business with whom **GBENGA OWOLABI, AISHA CADMUS, BERNADETTE ATTIA, FNU NJUH VALENTINE FOMBE**, or any accomplice/conspirator or any of them, as well as any communications with such victims or businesses;

32

2.  All images, messages, and communications regarding methods to avoid detection by law enforcement;

3.  Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to the location searched pursuant to this warrant.

4.  United States currency, foreign currency, cryptocurrency, checks, money orders, cash of any kind or cash equivalents, jewelry, coins, and bullion;

5.  Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses. The following definitions apply to the terms as set out in this affidavit and attachment:

   a.  Computer hardware:  Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

   b.  Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

   c.  Documentation: Computer related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

   d.  Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre set security functions when touches.  Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified

33

or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored.  This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms.  It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices

6. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   e. evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

   f. evidence of the times the COMPUTER was used;

   g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

   h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

   i. contextual information necessary to understand the evidence described in this attachment.

7. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

34

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or,

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

35

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 1005 N CAPITOL ST NE, APT 1410, WASHINGTON D.C. 20002 UNDER RULE 41 | SW No. ____19-346_____ <br><br> FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR SEARCH AND SEIZURE WARRANT**

I, G. Paul Samoska, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following location, 1005 N CAPITOL ST NE, APT 1410, WASHINGTON D.C. 20002, which is leased to AISHA CADMUS (the "DC LOCATION"), as further detailed in Attachment A.

2.      Notably, I submit this affidavit and related search warrant application to this Court as part of a coordinated effort that also includes submission of a substantively similar affidavit to the United States District Court for the District of Maryland in support of search warrants for an apartment (the "MD LOCATION"), a storage unit, and two vehicles used by GBENGA OWOLABI (a/k/a "Blow") and his partner/wife, OYINKANSOLA EZEKIEL.  Because the probable cause to search the DC LOCATION substantially overlaps with and is supported by the probable cause to search MD LOCATION in Maryland, I have kept references to both locations in this Affidavit.

3.      As detailed below, I submit there is probable cause to believe the GBENGA OWOLABI (a/k/a "Blow"), AISHA CADMUS, BERNADETTE ATTIA, FNU NJUH VALENTINE FOMBE, and others known and unknown have committed, among other crimes, wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), conspiracy to commit wire and bank

1

fraud (18 U.S.C. § 1349), money laundering (18 U.S.C. § 1956), and identity theft (18 U.S.C. §§ 1028, 1028A).   There is further probable cause to believe that fruits, evidence, and instrumentalities of these violations will be located in the DC LOCATION, as further described in Attachment B.

## AFFIANT BACKGROUND

4.      I have been a Special Agent of the Department of Homeland Security, Homeland Security Investigations (HSI), since July 2011 and am currently assigned to the Document and Benefit Fraud Task Force (DBTF).  Prior to employment with HSI, for approximately three years, I was a Special Agent with the Internal Revenue Service Criminal Investigation Division (IRS-CID).  Prior to IRS-CID, for approximately five years, I was a Special Agent with the United States Secret Service (USSS).  I have attended and completed the Criminal Investigator Training Program at Glynco, GA, as well as academies for HSI, IRS-CID, and USSS.  I have personally conducted and participated in numerous investigations involving criminal activity including but not limited to controlled substance offenses, firearms violations, money laundering, structuring, check fraud, bank fraud, credit card fraud, and identity theft.  I have participated in the arrest of numerous persons for involvement in these offenses.  I have also authored and/or executed numerous search and seizure warrants relating to controlled substance offenses, firearms violations, money laundering, structuring, bank fraud, check fraud, credit card fraud, bank fraud, wire fraud, and identity theft.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  I have set forth only the facts that I believe are

necessary to establish probable cause that violations of 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1956 (money laundering), and 1028 and 1028A (identity theft) have been committed, and that fruits, evidence, and instrumentalities of those crimes will be found in the DC LOCATION.

## PROBABLE CAUSE

6.      Business Email Compromise (BEC) Schemes are sophisticated scams conducted by organized fraud rings that target businesses and other entities in the financial sector which regularly perform wire transfers or other money transfers.   The fraud rings recruit co-conspirators to open and manage bank accounts for the sole purpose of receiving fraudulent wire transfers. These bank accounts are referred to as "drop" accounts.

7.      Once these "drop" accounts have been opened, victims are targeted with false wiring instructions sent to their email accounts from spoofed email accounts.  The victims are then instructed to send large wire transfers into the "drop" accounts.

8.      Once the wire transfers have entered the "drop" accounts, the funds are quickly depleted.  The most common methods of depletion are the purchase of cashier's checks, wire transfers to account holders in foreign countries, and cash withdrawals.

9.      In 2018, HSI Baltimore developed information that BERNADETTE ATTIA[1] was using fraudulently obtained identities of United States citizens to open drop accounts at banks, and to receive proceeds from BEC schemes.  The investigation also showed that ATTIA was depositing counterfeit checks into some of these same accounts and then attempting to withdraw funds before the bank determined that the check was counterfeit.  The investigation has led to evidence that

---

[1] On April 15, 2019 ATTIA was indicted in the District of Maryland for violations of 18 U.S.C. §§ 1343 and 1956, PWG-19-193 (under seal).

ATTIA conducted her fraudulent activities with, and often at the direction of, GBENGA OWOLABI (a/k/a Blow), among others.

10.     In particular, during the course of the investigation, investigators conducted federal search warrants in the District of Maryland on ATTIA's residence, electronic devices, email accounts, and an iCloud account (Crim Nos. 19-1351-TMD, 19-1211-CBD, 19-1213-CBD). Recovered pursuant to the execution of these warrants were copies of WhatsApp messaging conversations between OWOLABI and ATTIA in which the pair discuss their various fraud schemes.

11.     Several examples of the fraudulent activities conducted by OWOLABI and ATTIA, together with the relevant messages, are set forth herein.   However, these examples are a representative sample of the numerous fraudulent transactions OWOLABI and ATTIA discussed, together with others individuals known and unknown, for which there is substantial evidence.

**N.S.M./JBS HOLDINGS - WOODFOREST BANK**

12.     On December 11, 2017, at a Woodforest Bank branch in Maryland, a person purportedly having the initials "N.S.M." opened Woodforest Bank account x1077 in the name of JBS HOLDINGS (the "Woodforest NSM Account").   The account signature card reflected that the individual who opened the account, N.S.M., has social security number XXX-XX-0018, and was born on XX/XX/1978.   The signature card further reflects that N.S.M. presented as identification when she opened the account a Cameroonian passport bearing ID # 01718212.

13.     Law enforcement searched governmental databases for immigration records associated with Cameroon passport ID #01718212 and the name "N.S.M."   There were no records of non-immigrant or immigrant visas issued to that passport number/name combination; no records of any United States border crossings; and no U.S. Citizenship and Immigration Services records.

Notably, the passport provided to Woodforest Bank, which was maintained in bank files, reflects that the "surname" of the pictured individual is "N" and the "given name" is "S.M.," which is the opposite of the order in which names are conventionally listed, and which is an indication that the passport is fake.[2]

14.     On or about December 19, 2017, eight days after it was opened, the Woodforest NSM Account received an incoming ACH transfer in the amount of $49,671.90 from E&V, (hereinafter, "Victim Business 1").  Law enforcement interviewed representatives from Victim Business 1 who stated that the company was a victim of a BEC fraud scheme in which spoof email accounts were used to fraudulently induce Victim Business 1 to initiate the $49,671.90 ACH transfer to the Woodforest NSM Account.  Upon realizing it had been a victim of fraud, Victim Business 1 notified its own bank (the sending bank) and initiated a recall of the funds.  At the time of the incoming ACH transfer from Victim Business 1, the Woodforest NSM Account had an approximate balance of $100.

15.     On December 20, 2017, the day after the fraudulent wire, an individual purporting to be N.S.M. used funds in the Woodforest NSM Account to purchase a $20,000 cashier's check (No. 52500113) made payable to  MARIAN NANA PETERS.  The cashier's check was deposited on or about December 20, 2017, into Bank of America account No. x4551, held in the name MARIAN NANA PETERS, as will be further described below.

16.     In addition to this transaction, between December 19, 2017, and December 21, 2017, approximately $30,000 was withdrawn from the Woodforest NSM Account via over-the-counter cash withdrawals and debit card transactions.  Records obtained from MoneyGram reflect

---

[2] Law enforcement agents have interviewed the true N.S.M. with the social security number and date of birth provided to Woodforest Bank.  The true N.S.M. does not resemble the female pictured in the Cameroonian passport; ATTIA, however, does.

that some of these debit card transactions were in fact purchases of six MoneyGram money orders in various denominations, including a $500 money order payable to MARIAN NANA PETERS, and two $1,000 money orders payable to ATTIA.  The money orders payable to ATTIA were subsequently deposited into a Woodforest Bank Account opened by ATTIA in her own name.

17.     On or about December 27, 2017, about eight days after the fraudulent wire from Victim Business 1, and following the depletion of the fraud proceeds obtained therefrom, ATTIA deposited a $145,650.45 check into the Woodforest NSM Account.  The check was drawn upon a Regions Bank Account belonging to individuals having the initials "S.S." and "J.S."  This check was subsequently reported by Regions Bank to be counterfeit and/or unauthorized.  Prior to learning that the check was fraudulent, Woodforest used the ostensible check proceeds to return $49,671.90 to Victim Business 1 pursuant to the wire recall, but prevented any further loss from the Regions check.

18.     Following execution of a federal search warrant on ATTIA's iCloud account (mbifuo@icloud.com), investigators reviewed a WhatsApp chat messaging string between ATTIA and various accomplices and co-conspirators.  These messages included conversations between ATTIA and the following:  (1) 240-665-8292, stored in ATTIA's WhatsApp as, "Unku Valentine," and (2) 443-500-4420, stored in ATTIA's WhatsApp as, "Blow."

19.     Evidence obtained during the investigation establishes that WhatsApp user "Unku Valentine" is FNU NJUH VALENTINE FOMBE.  T-Mobile records reflect that, from June 30, 2017 to February 2, 2018, telephone number 240-665-8292 was subscribed to "Fnu Fombe," with the address 8175A Edge Rock Way, Laurel, Maryland.  The apartment building at this address is called the Avalon Russett.  Avalon Russett personnel confirmed that Apartment 8175A was leased to "Fnu Fombe" from July 2017 to July 2018; identified a picture of Fnu Njuh Valentine FOMBE

6

as "Fnu Fombe"; and, confirmed that "Fnu Fombe" provided telephone number 240-665-2892 to the apartment complex on leasing/tenant documents.  Avalon Russett personnel further stated that GBENGA OWOLABI was the leaseholder of a separate apartment in the Avalon Russett complex, and that they thought that OWOLABI was FOMBE'S brother-in-law.

20.     Evidence obtained during the investigation further establishes that WhatsApp user, "Blow," is Gbenga OWOLABI.  First, following her arrest for her role in the fraud perpetrated on Victim Business 1 (see PWG-19-193) ATTIA waived her *Miranda* rights and identified a photograph of OWOLABI as "Blow."  She further stated that she had engaged in the fraudulent activities involving JBS Holding at Blow's direction, and that Blow provided her with the fake N.S.M. passport.   Second, on December 20, 2018, I obtained a warrant for cellular location data associated with telephone number 443-500-4420 (Crim No. 18-3546-TJS).  The GPS pings were maintained for a period of 30 days.  During the entirety of that period, the phone never moved.  Rather, it appeared to ping off of the cellular tower in closed proximity to OWOLABI's Residence, that is 1624 Bluestone Apt E, Hanover Maryland 21076 (i.e., the MD LOCATION).

21.     WhatsApp messages between ATTIA and FOMBE (i.e., "Unku Valentine") in November and December 2017, just before ATTIA opened the Woodforest NSM Account state as follows, in relevant part:

| Date | Sender | Message |
|---|---|---|
| 11/16/2017 | ATTIA | Abeg u get any name is fit use make new PP[3] |
| | FOMBE | I get for buy bitcoin do it |
| | FOMBE | Will take care of that shortly |
| | ATTIA | Ok Bro cos they deny to open me sunny[4] |
| | ATTIA | So dude want make me new po |
| | ATTIA | Pp |

---

[3] Based on my experience investigating this case and other BEC schemes, I believe that the term "Pp" is an abbreviation for "passport."

[4] Based on my experience investigating this case and other BEC schemes, I believe that the term "sunny" refers to a SunTrust Bank account.

| Date | Sender | Message |
|------|--------|---------|
| | FOMBE | K |
| 12/6/2017 | FOMBE | [*Image of Equifax cover sheet for N.S.M.*] |
| | ATTIA | Yesssss |
| | ATTIA | Make I create EIN then cam print for morning |
| | FOMBE | [*Image of Equifax credit score 818*] |
| | ATTIA | Yes na e |
| | FOMBE | Ein can only b created during business hours |
| | FOMBE | [*Image of N.S.M.'s personal identifying information*] |
| | FOMBE | Send me ya email |
| | ATTIA | Ohhh ok make I wait till morning |
| | ATTIA | bernattia@yahoo.com |
| 12/10/2017 | ATTIA | Account Name BOA: JBS HOLDING LLC<br>Bank: BOA<br>Account #: 446040028075<br>Routing #: 052001633<br>Wires # 026009593<br>Swift Code : BOFAUS3N<br>Address: 6916 Andersons Way, Apt 304 Laurel MD 20707 |
| | ATTIA | Account Name : JBS HOLDING LLC<br>BANK: SUNTRUST<br>Account #: 1000207684720<br>Routing # : 055002707<br>Swift Code : SNTRUS3A<br>Address: 6916 Andersons Way, Apt 304 Laurel MD 20707 |
| | FOMBE | Wettin b last 4 of ein and ss |
| | ATTIA | EIN :8932<br>SS : 0018 |
| 12/11/2017 | ATTIA | Account Name : JBS HOLDING LLC<br>BANK: WOODFOREST<br>Account #: 1582001077<br>Routing #: 053112592<br>Address : 6916 Andersons Way, Apt 304 Laurel MD 20707 |
| 12/12/2017 | FOMBE | [*Image of chat with unknown individual copying information for the BOA JBS Holdings account and stating "We use this on for 454 today . . .  Money should be in tomorrow morning."*[5]] |
| | ATTIA | Ahhh |
| | ATTIA | Perfect soup |
| | FOMBE | Just pray do meditate make e waka |
| | ATTIA | Ah I dey on my knees now so |

---

[5] Bank of America does not have records of such a transaction in the JBS Holding account opened by N.S.M.

22.     Meanwhile, ATTIA and OWOLABI (i.e., Blow) engaged in the following WhatsApp communications (in relevant part):

| Date | Sender | Message |
|---|---|---|
| 12/14/2017 | ATTIA | Account Name : JBS HOLDING LLC<br>BANK: WOODFOREST<br>Account #: 1582001077<br>Routing #: 053112592<br>Address : 6916 Andersons Way, Apt 304 Laurel MD 20707 |
| | ATTIA | Na last four of the business u need |
| | OWOLABI | Yup |
| | OWOLABI | Ein |
| | OWOLABI | or pin |
| 12/14/2017 | OWOLABI | or both |
| | ATTIA | EIN:8932 |
| | ATTIA | Pin 1985 |
| 12/15/2017 | ATTIA | Any news bro |
| 12/19/2017 | OWOLABI | [*Image of invoice to Victim Business 1 for $49,671.90*] |
| | OWOLABI | [*Image of wiring instructions to Victim Business 1 listing Woodforest NSM Account*] |
| | OWOLABI | We on 2mrw |
| 12/20/2017 | OWOLABI | [*Audio recording of automated Woodforest Bank banking system reflecting a $49k balance in Woodforest JBS Holding x1077 acct*] |
| | OWOLABI | Marian nana Peters |
| | OWOLABI | [*Image of 20,000 deposit into Bank of America account ending x4551*][6] |

23.     Based on my training and experience investigating BEC schemes, I believe that these WhatsApp messages show that OWOLABI either conducted the email compromise part of the BEC fraud scheme or that he was in contact with the individual or individuals who did so. Specifically, in the above-referenced chat string OWOLABI sent ATTIA a copy of an invoice with the name of Victim Business 1, as well as a copy of the fraudulent wiring instructions Victim Business 1 received. I believe that these images were sent to ATTIA so she would have accurate

---

[6] This is the bank account held in the name of MARIAN NANA PETERS into which the $20,000 cashier's check purchased with the fraud proceeds in the Woodforest NSM Account was deposited.

information to provide to Woodforest if she were questioned about the source of the funds arriving in the Woodforest N.S.M. Account.  I further believe that OWOLABI asked ATTIA to obtain new personal identifying information to be used to open drop accounts after SunTrust refused to open one for her; that ATTIA obtained such information from FOMBE (ATTIA messages FOMBE, "u get any name fit use make new PP[?]" because "they deny me open sunny" and "dude [believed to be OWOLABI] want make me new . . . pp"); and, that ATTIA, FOMBE, and OWOLABI thereafter misused N.S.M.'s identity to receive proceeds from BEC schemes, among other fraud, including the $145,650.45  fraudulent check drawn on the Regions Bank account held in the name of S.S. and J.S., which is also discussed in the chats between ATTIA and OWOLABI.

## ASHLEY SMITH – CAPITAL ONE BANK

24.     On July 18, 2017, Capital One Bank Account No. x3959 was opened in the name of ASHLEY SMITH at the Capital One Bank branch in Arundel Mills, Maryland (the "Smith Capital One Account").  At opening, a Great Britain passport #898405917 in the name of ASHLEY SMITH was presented to Capital One as proof of identification.  The initial address listed on the account was 3508 Hubbard Road, Hyattsville, Maryland 20785 and the phone number associated with the account was 773-817-7581 (as further described below, this telephone information was also identified as belonging to "Ashley Smith" on the lease for a storage unit that is the subject of an application for a search warrant in Maryland).

25.     Capital One statements for the Smith Capital One Account reflect multiple addresses associated with ATTIA.  Specifically:

a.      From August 2017 to November 2017, statements for this Capital One account were mailed to 81758 Edgerock Way, Laurel, MD 20724.  As set forth above, FNU NJUH

VALENTINE FOMBE leased 8175A Edgerock Way during this period, and evidence obtained during the investigation reflects that ATTIA resided with the FOMBE family at this residence.

   b. From December 2017 to February 2018, statements were mailed to 6916 Anderson Way, Apartment 304, Laurel, Maryland 20707.  ATTIA leased apartment 304 in the name of A.W., with a secondary leaseholder of BERNADETTE MBI, from approximately October 2017 to October 2018.  A.W. was determined to be a real person who had been a victim of identity theft.  Employees for the management company that leased the apartments located at 6916 Anderson Way identified a photograph of ATTIA as the person they knew as "A.W."

   26. On January 19, 2018, check # 9184 drawn on a Central Pacific Bank account held in the names of Victims B.K. and C.K. was deposited into the Smith Capital One Account.  The $16,549 check was payable to ASHLEY SMITH.  The check was subsequently determined to be fraudulent, and only approximately $500 of the deposited amount was able to be withdrawn before Capital One identified the check as counterfeit.

   27. In the same WhatsApp conversation between ATTIA and OWOLABI (i.e., "Blow") set out above, investigators recovered the following messages (in relevant part):

| Date | Sender | Message |
|---|---|---|
| 12/29/2017 | OWOLABI | The mail is at the front desk bro |
| | ATTIA | If it's at the front desk does it have [A.W.] on it |
| | ATTIA | If not they won't give me |
| 1/16/2018 | OWOLABI | So which name mail sure 4 that address |
| | OWOLABI | JBS? |
| | ATTIA | Yes |
| | ATTIA | And my name |
| | OWOLABI | Okay |
| | OWOLABI | Will send in JBS |
| | ATTIA | Wait |
| | ATTIA | JBS no get any open account |
| | OWOLABI | You |
| | OWOLABI | Na mail |
| | OWOLABI | [A.W.] |

| Date | Sender | Message |
|---|---|---|
| | OWOLABI | [*Image of mail label from "sender" Victim C.K. to recipient A.W. at address 6916 Andersons Way, Laurel, Maryland*] |
| | ATTIA | Ok |
| 1/17/2018 | OWOLABI | Mail on Friday |
| | ATTIA | Ok |
| | OWOLABI | Ashley Smith |
| | ATTIA | Finally |
| | OWOLABI | It's about to go down |
| | OWOLABI | Lol |
| | ATTIA | Lol |
| 1/19/2018 | OWOLABI | Send me the picture of the checque as well pls |
| | OWOLABI | Bank name-capital one Bank acc no- 1358213959  bank Routing no-065000090 ACC NAME-ASHLEY SMITH |
| | OWOLABI | Thanks dear |
| | ATTIA | [*Image of $16,549 check payable to "Ashley Smith" and drawn on a Central Pacific Bank account held by Victims B.K. and C.K.*] |



| Date | Sender | Message |
|------|--------|---------|
| 1/19/2018 | OWOLABI | Great |
| | ATTIA | Deposit almost |
| | OWOLABI | I trust you |
| | ATTIA | [*Image of deposit slip from Capital One Bank reflecting $16,549 deposit into an account ending x3959, i.e., the Smith Capital One Account*] |
| | OWOLABI | You are a darling |
| | OWOLABI | Fingers crossed |

28.     Based up on my training and experience, I believe that this conversation shows that OWOLABI and ATTIA were engaged in a scheme to commit bank fraud.   Specifically, OWOLABI is confirming with ATTIA the name and address to which he should mail a package. ATTIA tells him to send it to A.W., as that is the name on the apartment lease and will allow her to pick up the mail.   OWOLABI then arranges to have a parcel sent to ATTIA.   The parcel references a sender of "C.K.," which is the same name that is on the fraudulent check that ATTIA later photographs and sends to OWOLABI.   Based upon my training and experience, OWOLABI or his associates identified the sender as Victim C.K. to make sure that, if the parcel were opened and inspected, the fraudulent check on the inside would correspond to the sender and thus avoid suspicion.

29.     OWOLABI then tells ATTIA that mail for "Ashley Smith" (the payee on the fraudulent check) will be arriving on Friday, and ATTIA responds with a picture of a check.   I have reviewed bank records provided by Capital One Bank and believe the picture of the check ATTIA sends to OWOLABI is the check that is deposited into the Smith Capital One account. ATTIA, as reflected by the chat messages, was the individual who deposited this item, or caused it to be deposited, as she sends a picture of the deposit slip to OWOLABI to confirm it.   I further believe that when OWOLABI says "fingers crossed" he is referring to the fact that he knows the

check is fraudulent and is hoping that it avoids detection by the banks until he can withdraw the funds.

### DAIRY FARMER(S) OF AMERICA LLC

30.     On April 17, 2019, pursuant to a search warrant from the District of Maryland (Crim No. 19-1351-TMD), law enforcement seized an iPhone X belonging to ATTIA at her residence in Annapolis Junction, Maryland.  An examination of the WhatsApp chats on the phone showed messages between ATTIA and the phone number 702-462-4099, listed in ATTIA'S phone as "Blow Iskaba" and later identified by ATTIA as belonging to OWOLABI.

On March 27, 2019, ATTIA sent "Blow Iskaba" the following image:



On the same day, OWOLBAI responded, "Great."

31.     Maryland State business records showed that on January 30, 2019, ATTIA registered the company DAIRY FARMER OF AMERICA LLC using her address in Annapolis Junction, Maryland (the one that was subsequently searched).   ATTIA told investigators that OWOLABI instructed her to register DAIRY FARMER OF AMERICA LLC with the state of Maryland, gave her $200, and drove her to the Maryland government office where she registered it.  She further told investigators that she gave all of the registration documents to OWOLABI. ATTIA stated that, per OWOLABI'S instructions, she attempted to open an account online at PNC bank in the name of DAIRY FARMER OF AMERICA LLC but the account opening was rejected by PNC.

32.     On April 16, 2019, a LETITIA HALE registered the company DAIRY FARMERS (with an "s") OF AMERICA LLC with the state of Maryland.  HALE listed the address for the company as #102, 6104 Breezewood Drive, Greenbelt, Maryland 20770.

33.     Investigators obtained records from PNC Bank reflecting that, on April 17, 2019, LETITIA HALE opened a PNC Bank Account ending x6702 in the name of DAIRY FARMERS OF AMERICA.  The account listed an address of 6104 Breezewood Drive, Greenbelt, Maryland 20770.

34.     After it was opened, the account had minimal activity until May 7, 2019, when check #001826 in the amount of $318,780 was deposited into it.  The check was drawn on the Cobank Account of C.W.T, a victim business.  The check was made out to "Dairy Farmers of America."  The check was determined to be fraudulent and was returned uncashed to Cobank.

35.     Based upon my training and experience investigating fraud schemes, I believe that OWOLABI instructed ATTIA to open an account at PNC Bank in the name of DAIRY FARMER OF AMERICA LLC for the purpose of using the account to commit fraud.  I further believe that

15

after ATTIA was unable to open a bank account, OWOLABI recruited LETITIA HALE to open PNC Account No. 6702 for the purpose of committing fraud.

**THE DC LOCATION - CADMUS (a/k/a MARIAN NANA PETERS) RESIDENCE**

### A.   MARIAN NANA PETERS' BANK OF AMERICA ACCOUNTS

36.    On October 14, 2017, Bank of America accounts x4548 and x4551 were opened in the name of MARIAN NANA PETERS at the Bank of America branch located in Columbia, Maryland.  The account opening documentation showed that a foreign passport bearing the number G0387964 was used as identification by the individual who opened it.  Bank of America did not provide the country of origin for the passport.  The DC LOCATION was listed as the address for these accounts.  As further discussed below, I believe that MARIAN NANA PETERS is actually AISHA CADMUS, who resides at the DC LOCATION.

37.    As stated above, proceeds from the fraud conducted on Victim Business 1 (E&V) through the Woodforest NSM Account (including a $20,000 cashier's check) were deposited into Bank of America account x4551.  The WhatsApp messages set forth above, which discuss the fraud on Victim Business 1, reflect that OWOLABI had control over this MARIAN NANA PETERS account as he directed ATTIA to make the deposits into it.  Following the $20,000 deposit, some of the funds were electronically transferred to account x4548 (also held in the name of MARIAN NANA PETERS) and the entirety of the proceeds were withdrawn via ATM and in branch cash withdrawals.

### B.   MARIAN NANA PETERS' WELLS FARGO ACCOUNT

38.    Two days after Bank of America accounts x4551 and x4548 in the name of MARIAN NANA PETERS were opened, on October 16, 2017, Wells Fargo Bank Account x0888 was opened, also in the name of MARIAN NANA PETERS.  The account opening documentation

showed that a Ghana passport bearing the number G0387964 (also used on the Bank of America account) was used as identification by the individual who opened Wells Fargo x0888.  The passport showed a date of birth of January 14, 1990, and listed the phone number as 301-543-7450.   The DC LOCATION was listed as the address for this account as well.

39.     On December 28, 2017, check # 103 drawn on the Central Pacific Bank account belonging to Victims R.I and F.I. was deposited into Wells Fargo Bank account x0888.  The check was made out to MARIAN NANA PETERS and was in the amount of $24,845.  The check was subsequently determined to be fraudulent, and returned to Wells Fargo as unpaid.  Prior to the check's return, fraud proceeds were withdrawn via ATM and in-branch cash withdrawals.

40.     A WhatsApp chat string between OWOLABI and ATTIA reflects the following communications about this fraudulent check and its deposit into Wells Fargo x0888, beginning with the image depicted below:



| Date | Sender | Message |
|---|---|---|
| 12/29/2017 | OWOLABI | Please call them before they shut down for the holidays |
| | OWOLABI | EG039175541CA |
| | ATTIA | Call who |
| | OWOLABI | USPS |
| | OWOLABI | Bank name-wells Fargo<br>Acc no- 1928790888<br>Routing no-055003201<br>Wires-121000248 |

| Date | Sender | Message |
|---|---|---|
| | | Marian Nana Peters |
| | ATTIA | [*Image (below) of deposit slip for $24,845 into Wells Fargo x0888*] |
| | OWOLABI | You are a star |



41.     Based on my training and experience, and my investigation in this case, I believe that this chat string shows that OWOLABI sends ATTIA a picture of a parcel that is addressed to ASHLEY SMITH.   As the parcel purports to be from Victim F.I., and the fraudulent check deposited into the Wells Fargo x0888 purports to be drawn on Victim F.I.'s bank account, I submit that this parcel contained the fraudulent check, which OWOLABI directs ATTIA to deposit into the Wells Fargo x0888 account held in the name MARIAN NANA PETERS.   Indeed, a few days after the deposit into Wells Fargo x0888, ATTIA sends a picture to OWOLABI of a *second* fraudulent check, dated a few days later, also purportedly drawn on F.I.'s account.   The images of the two checks (one obtained from Wells Fargo and deposited into account x0888) and one obtained from the WhatsApp chat between ATTIA and OWOLABI are set out below.

Wells Fargo Record of Deposited Check into Account x0888



Image of Check Obtained from WhatsApp Chat Between ATTIA and BLOW

## C.     MARIAN NANA PETERS' SUNTRUST ACCOUNT

42.     Investigators received information from Bank of America reflecting that the account ending x2166 was opened on January 24, 2018, in the name of ZEN TEL LLC with the signer listed as A.Z.  Based on initial information received by law enforcement from the bank, A.Z. is believed to be a real person located in Ohio who is an unknowing victim of identity theft.

43.     On March 23, 2018, the ZEN TEL LLC Bank of America account received an incoming wire transfer in the amount of $57,000 from a BMO Harris Bank account belonging to J.M.  On March 26, 2018, the Zen Tel LLC Bank of America account received an incoming wire

transfer in the amount of $50,500 from a First Midwest Bank account belonging to J.H., wife of J.M.  HSI Special Agents interviewed J.M. and J.H. who stated that they fell victim to a BEC fraud scheme and, as a result, they sent the wire transfers — which were actually intended to serve as a down payment to a title company — to the ZEN TEL LLC bank account.

44.     After the two wire transfers entered the ZEN TEL LLC Bank of America account, the majority of the funds were quickly withdrawn, primarily via cash withdrawals and checks. Check #1009 from the Zen Tel account was a $49,850 check made payable to MARIAN NANA PETERS.  The check was deposited into SunTrust Account No. x2973 on March 26, 2018.

45.     That account, SunTrust x2973, was opened about a month earlier, on February 23, 2018, in the name of MARIAN NANA PETERS.  The account listed a date of birth of January 14, 1990, and a phone number of 301-543-7450 (the same information provided on Wells Fargo x0888).  The DC LOCATION was listed as the address for the account.

46.     SunTrust records further reflect that on the same date SunTrust x2973 was opened, MARIAN NANA PETERS opened a second account ending x1264.  PETERS likewise provided the DC LOCATION as the address for this account.

47.     Following the deposit into SunTrust account x2973 of the $49,850 Zen Tel check, $15,000 was transferred to SunTrust account x1264.  The funds were then withdrawn from both accounts primarily via checks written to MARIAN NANA PETERS and cash withdrawals. Surveillance footage obtained from SunTrust ATMs depicts that on March 30, 2018, OWOLABI withdrew $500 from the SunTrust x1264 account in the name of MARIAN NANA PETERS.  On April 11, 2018, surveillance video reflects that OWOLABI was the passenger in a vehicle, the driver of which withdrew $1,000 from the account, which appears to be handed to OWOLABI as the car pulls away.

20

### D.  MARIAN NANA PETERS' CAPITAL ONE ACCOUNT

48.     Investigators received information from Capital One Bank reflecting that account x4864 was opened in the name of MARIAN NANA PETERS on October 16, 2017.  The account opening documentation showed that a Ghana passport bearing the number G0387964 was presented as proof of identification.[7]  The passport showed a date of birth of January 14, 1990, and listed the phone number as 301-543-7450.

49.     On June 4, 2018, SunTrust Official Check #6847016703 in the amount of $14,500 was deposited into Capital One Account x4864.  The check was purchased by SKANSKA USA BUILDING and made out to MARIAN NANA PETERS.

### E.  IDENTIFICATION OF AISHA CADMUS AS MARIAN NANA PETERS

50.     Investigators have conducted multiple searches of immigration and visa/travel databases in order to find information related to a Ghana passport in the name of MARIAN NANA PETERS and/or bearing passport number G0387964.  All searches have been negative.

51.     The DC LOCATION is located in the John and Jill Ker Conway Apartment Building in Washington, DC.  Investigators obtained leaseholder records reflecting that the DC LOCATION is currently leased to AISHA CADMUS, and that CADMUS has been the sole leaseholder since March 2017, when she moved in.

52.     On September 19, 2019, I spoke to the manager of the John and Jill Ker Conway Apartments, who positively identified a picture of CADMUS as the person the manager knew to be the resident of apartment 1410, i.e., the DC LOCATION.  The manager further confirmed that CADMUS continues to reside in the DC LOCATION.

---

[7] This is the same passport number that is on the account opening paperwork for the Bank of America and Wells Fargo bank accounts opened in the name of MARIAN NANA PETERS.

53.     Investigators also obtained the visitor sign in logs for the John and Jill Ker Conway Apartment building.  The logs showed that between October 10, 2017, and January 21, 2018, OWOLABI signed the logs stating that he was going to visit the DC LOCATION.  Per interviews with building staff, after signing the log, CADMUS would have had to authorize OWOLABI to enter the building.

54.     In June 2019, HSI Special Agents received information from New York City Police Department detectives who were conducting an investigation into BEC Fraud schemes conducted by TADJUDEEN SULAIMON.  Specifically, the NYPD detectives stated that SunTrust Official Check #6847016703 in the amount of $14,500 represented proceeds of a BEC fraud scheme conducted by SULAIMON, and that SULAIMON had traveled to Maryland at the same time the check was deposited into Capital One account x4864 (held in the name of MARIAN NANA PETERS) to launder some of the proceeds from his BEC schemes.  An analysis of phone tolls showed multiple phone contacts between SULAIMON and the phone number 443-500-4420 which, as discussed above, is associated with "Blow."

55.     In August 2019, SULAIMON was arrested by New York City Police Detectives in connection with state (New York) fraud charges.  A search warrant was also executed on several cellular telephones belonging to SULAIMON.  New York City Police Detectives informed me that, during the examination of cellular devices belonging to SULAIMON, they discovered several photographs of CADMUS on the phones.  The shape of the photographs appeared to indicate that they were the type of images that would be used to create a passport.

56.     Investigators also obtained subscriber and phone tolls for the phone number 301-543-7450.  Subscriber information showed that the phone has been registered to DEOLA DASILVA since it was opened on October 12, 2017.  The address listed on the account was for an

AT&T wireless store in Laurel, MD.   The phone tolls also showed multiple phone calls between phone numbers known to your affiant to be utilized by OWOLABI.  Billing information showed that phone was still active with the last call made on July 2, 2019.

57.    In addition, ATTIA was shown a picture of CADMUS and stated that on multiple occasions CADMUS arrived at her apartment with OWOLABI and picked up checks that OWOLABI sent or caused to be sent to ATTIA in the mail.  ATTIA stated that one of the checks that OWOLABI and CADMUS picked up was made out to MARIAN NANA PETERS.

58.    I am aware that in wire fraud and money laundering schemes, the perpetrators of the fraud often go to great lengths to avoid detection of law enforcement.  One way is they do this by opening up bank accounts under aliases.  These aliases help the perpetrators launder the proceeds of their fraud schemes as it prevents law enforcement from locating and interviewing the individuals involved in the fraud scheme.

59.    Based upon my training and experience, and the evidence obtained to date (including ATTIA'S statement that she obtained a fake passport in the name N.S.M. from OWOLABI), I submit there is reason to believe that OWOLABI directed AISHA CADMUS to open multiple bank accounts in the name of a fake person, MARIAN NANA PETERS, and that OWOLABI further provided CADMUS with a fake a Ghana passport bearing the number G0387964 that she used to open the accounts.  I further believe that OWOLABI provided this fake identification in the name of MARIAN NANA PETERS to CADMUS so that if law enforcement conducted an investigation into the whereabouts of the fraudulently obtained funds, they would be unable to locate and interview the holder of the account, thus evading law enforcement and allowing OWOLABI to more easily launder the proceeds from his fraud schemes.

**PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED**

60.     Based on my training and experience as a special agent with HSI and IRS-CI, the investigation to date, and previous investigations and searches, as well as common knowledge, your affiant has reason to believe criminals (just like non-criminals) maintain records regarding bank accounts, real property records, business records, and tax records at their residences. Such records would include banking institutions and account numbers, bank account signature cards and account opening documentation, bank statements, check books and cancelled checks, account deposits and offsets, paperwork regarding safe deposit boxes established and/or maintained, paperwork and passwords pertaining to electronic banking for domestic and offshore bank accounts, real estate purchases, sales, and general records, utility documents, deeds, titles, investment properties, income, and expenses, real estate tax documents, vehicle purchase, sale, or maintenance records, business and/or trust records, agreements, contracts, client listings, domestic and international business transactions, business tax returns and related tax documents, individual income tax returns and related tax documents, mailings to/from the IRS, state, or local taxation entities, and other tax-related records and/or correspondence further described as items to be searched for in Attachment B.

61.     I also know that criminals often withdraw funds from bank accounts tied to their fraudulent conduct in order to attempt to conceal the funds in the form of cash or cash equivalents. Based on my training and experience, I also know that criminals often store the fraudulently obtained cash or cash equivalents in concealed locations within their residence.

62.     I am also aware that individuals engaged in BEC fraud schemes use their vehicles in furtherance of their fraud.  This usage typically consists of driving to set up fraudulent bank accounts and businesses, and driving to facilitate the withdrawal of fraudulently obtained funds.

63.     As stated above, BEC fraud schemes are sophisticated in nature and rely extensively on the ability of the co-conspirators to have frequent communication and also have the ability to quickly send electronic images of documents such as hacked emails and wire instructions that will allow the conspirators to complete the BEC fraud.  I also know that the members of theses fraud schemes are often times located in various countries that have significantly different time zones, and that communication between fraud scheme members takes place at all hours of the day and night.  As such, the members of the fraud schemes keep their electronic devices such as cellular telephones in close proximity to them at all times, including in their residences.

64.     I am aware from prior experience that members of BEC fraud schemes, and this BEC fraud scheme in particular, frequently accomplish this need for communication through the use of third-party messaging applications, such as WhatsApp and Facebook Messenger, which are stored on electronic devices.  Members of fraud schemes also employ these third-party messaging applications in part to avoid law enforcement detection. WhatsApp uses end-to-end encryption and Facebook Messenger can be set to use end-to-end encryption. As a result, the messages being sent between members of the fraud scheme cannot be intercepted, and will only reside in an unencrypted form on the actual devices from which they were sent or received.

65.     I am aware from prior investigations where I have reviewed the contents of electronic devices (pursuant to search warrant or consent) utilized by individuals involved in the investigation.  Based on these searches, I am aware that law enforcement officers were able to obtain valuable evidence of fraud schemes and criminal wrongdoing in the various components of a cellular phone and/or computer including, but not limited to, call logs, contact lists, text messages, GPS locations, photos, videos, applications, documents, e-mails, and notes.

66.     I am also aware, from prior experience, that analysis of the names and telephone numbers contained in cellular telephones as well as sent and received text messages is very useful to law enforcement and provides valuable evidence concerning the scope of the contact on cellular telephones. In addition to the ability to store names and numbers, many cellular telephones have the technical capability to store email, text messages, photos, IP addresses and voice recordings, browse internet websites, and utilize GPS features, which have also proven to be valuable information for law enforcement.

67.     As set forth in this affidavit, investigators believe GEBENGA OWOLABI to be a leader of BEC and bank fraud ring operating in Maryland.   Investigation further reflects that AISHA CADMUS, through her use of the alias of MARIAN NANA PETERS, was a vital component of OWOLABI'S fraud schemes by allowing him to successfully lauder the proceeds of his fraud scheme and thus avoid detection by law enforcement.   Based upon my training and experience, and knowledge of these fraud schemes, I believe that GBENGA OWOLABI is concealing evidence of his criminal violations as well as the fruits and instrumentalities of these violations in the MD LOCATION.   I further believe that AISHA CADMUS is concealing evidence of her criminal violations as well as the fruits and instrumentalities of these violations at the DC LOCATION.

68.     I am also aware that criminals often use residences and or other locations that are not associated with them in which to store both evidence from their criminal violations, as well the fruits and instrumentalities of these crimes.   The purpose of this is to store these items in a place that they feel is either unknown to law enforcement, or not associated with them and thus they will avoid detection.   Many times these locations are rented in an identity that is not in any

way associated with the criminal thus preventing law enforcement from being able to link the separate locations.

## SEARCH OF ELECTRONIC INFORMATION

69.     As described above and in Attachments A and B, this application seeks permission to search and seize items that might be found in the DC LOCATION in whatever form they are found.  I submit that, if a computer or electronic medium is found on the premises, there is probable cause to believe relevant records and communications will be stored in that computer or electronic medium.

70.     Based on my knowledge, training, and experience, and consultations with a Special Agent with HSI who has extensive training in collecting and analyzing computer evidence, I know:

71.     Computer storage devices such as hard disks can store the equivalent of millions of pages of information.  Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant;

72.     The most forensically sound, effective, and complete way to analyze data from the computer is to create an electronic "image" of the computer media.  As "imaging" is not always possible or practical, a computer specialist will decide whether to employ this or another method;

73.     "Imaging" is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files designed to protect the integrity of the evidence. "Imaging" a computer permits the computer specialist to obtain an exact copy of the computer's

stored data.  The computer specialist will then analyze data from the "mirror image" copy.

"Imaging" is preferable to searching and extracting files from a hard drive because, in many cases,

search techniques may not yield the evidence described in the warrant.  Additionally, computer

evidence is vulnerable to inadvertent or intentional modification or destruction (either from

external sources or from destructive code imbedded in the system as a "booby trap").  Therefore,

a controlled environment is preferential to conduct an accurate and safe analysis.  In light of these

difficulties, HSI intends to conduct its searches offsite and use whatever data analysis techniques

appear necessary to locate and retrieve the items described in Attachment B;

74.    The computer specialist will try to image computers on site if possible.  If the

computer investigative specialist successfully images the computers, there will be no need to seize

the actual equipment.  If imaging proves impractical, or even impossible for technical reasons, I

hereby request the Court's permission to seize the computer hardware (and associated peripherals)

that are believed to contain some or all of the evidence described in the warrant, and to "image"

or analyze the device(s) off-site;

75.    Computer files or remnants of such files can be recovered months or even years

after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic

files downloaded to a hard drive can be stored for years at little or no cost.  Even when files have

been deleted, they can be recovered months or years later using readily available forensics tools.

This is so because when a person  "deletes" a file on a computer, the data contained in the file does

not actually disappear; rather, that data remains on the hard drive until it is overwritten by new

data;

76.    Deleted files, or remnants of deleted files, may reside in free space or slack space—

that is, in space on the hard drive that is not currently being used by an active file—for long periods

of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

77.     Files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them;

78.     Some types of data are hardware dependent and need a piece of hardware, such as an encryption key for a software program to run or data to be accessed.  In these cases, it is necessary to seize the required hardware or encryption key to access this data; and

79.     Cellular telephones, personal digital assistants (PDAs), smart phones, and tablets are computer-type devices capable of creating, storing, and transmitting electronic data and are believed to contain some of the evidence described in the warrant.  For example, most of these devices can contain address books, correspondence in the form of e-mails and text messages, electronic receipts, photographs that may identify assets and associates, and other documents found on computers and in paper form.  Because of the vast number of different devices on the market, and the complexity of analyzing some of the devices, I hereby request the Court's permission to seize these or similar devices and to "image" or analyze the device(s) off-site.

## CONCLUSION

80.     For the above-stated reasons, I respectfully request that search warrants be issued for the premises described in Attachments A,   for the items and information further described in Attachment B.

29

Respectfully submitted,

Special Agent G. Paul Samoska
Homeland Security Investigations

Sworn to before me this 23rd day of September 2019

HON. G. MICHAEL HARVEY
United States Magistrate Judge